**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
DANIEL THOMAS,                                   :
                                                 :
        Petitioner,                              :
                                                 :
            -against-                            :        04 Civ. 8664 (JFK)
                                                 :        02 Cr. 991 (JFK)
UNITED STATES OF AMERICA,                        :        **OPINION AND ORDER**
_____            :
        Respondent.                              :
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>APPEARANCES:</u>

_____For the Petitioner:

        DANIEL THOMAS, <u>pro</u> <u>se</u>
        Reg. No. 53973-054
        U.S. Penitentiary Allenwood
        P.O. Box 3000
        White Deer, PA 17887-3000

For the Respondent:

        MICHAEL J. GARCIA, United States Attorney, S.D.N.Y.
        One Saint Andrew's Plaza
        New York, New York 10007
        Of Counsel: AUSA Thomas G. A. Brown

**JOHN F. KEENAN, United States District Judge**

Petitioner Daniel Thomas ("Thomas") moves pro se to vacate, set aside, or correct his conviction and sentence, pursuant to 28 U.S.C. § 2255.  For the reasons set forth below, the petition is denied.

## Background

On the night of July 14, 2002, Detective Albert Rosario ("Detective Rosario") of the New York City Police Department saw Thomas and a woman walking in the middle of 171st Street in the Bronx.  The woman appeared to be supporting Thomas, and as Detective Rosario approached he could see that the man was bleeding heavily from the shoulder.  As Thomas tried to flag down a livery cab, Detective Rosario stopped him.  Detective Rosario identified himself, and Thomas said they were on their way to the hospital.  Detective Rosario could see that Thomas' leg was also bleeding and radioed for an ambulance.  (Tr. 71-73, Jan. 7, 2003.)

Before being taken into custody, Thomas told Detective Rosario that he had been in a fight up the block and had taken a gun from his assailant, who then stabbed him.  Thomas told Detective Rosario that the name of his assailant was Raheem.  Detective Rosario asked where the gun was, and Thomas moved to get the gun from the side pouch of his overalls.  Detective Rosario told Thomas not to take the gun out, but Thomas insisted.  The gun seemed to be stuck, but it eventually jostled down his pant leg.  Detective Rosario recovered the gun, a loaded .44 magnum Smith & Wesson revolver.  At around this time, the woman who had been helping Thomas left the scene without speaking to the police.  Thomas was arrested after police backup arrived and was taken to a hospital in an ambulance for treatment. (Tr. 73-78, 82.)

According to Thomas, on July 14, 2002, he had been visiting friends in the area of 171st

Street and Wythe Place where Thomas had a heated confrontation with Raheem Hansberry ("Hansberry") over Hansberry's use of teenagers to facilitate his drug dealing.  Thomas had known Hansberry for a very long time.  They had lived in the same apartment building and for a time Hansberry had lived with Thomas and his wife.  Thomas' relationship with Hansberry had allegedly soured because of Thomas' disapproval of Hansberry's employment of young teenagers in the drug trade.  (Tr. 161-68.)

A second confrontation occurred around 11 pm, when Thomas claims he was trying to convince several teenagers to stop dealing drugs for Hansberry.  As Hansberry confronted Thomas, Hansberry reached into a nearby garbage can to retrieve a gun.  Thomas was able to snatch the gun from Hansberry, then backed away and stuck the gun in his pants.  Hansberry began stabbing Thomas, threatening to kill him, and Thomas began backing up from Wythe onto 171st Street.  Hansberry stabbed Thomas numerous times, below the eye, on the shoulder and collarbone, and in the thigh, as Thomas backed into a parked car and then fell down on 171st Street.  Hansberry turned around and walked away, and Thomas began to run down 171st Street where he encountered Detective Rosario.

## Procedural History

On July 26, 2002, Thomas was indicted for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).

### 1. Rule 609 Motion

Before trial, the government moved in limine for permission to impeach Thomas, if he testified, with his three prior felony convictions: a 1980 robbery conviction involving a .22 caliber pistol, a 1989 attempted robbery conviction involving a metal pipe, and a 1996 robbery

3

conviction involving an ice pick. Thomas opposed the motion in a letter dated December 27, 2002.

At a pretrial conference on January 3, 2003, the Court ruled that the government would be allowed to impeach Thomas with the 1980 and 1996 robbery convictions, pursuant to Rule 609(a)(2) of the Federal Rules of Evidence ("Fed. R. Evid.").  (Tr. 12-13, 23-24, Jan. 3, 2003.) Rule 609(a)(2) states that "evidence that any witness has been convicted of a crime shall be admitted...if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness."  The Court commented: "[a]ll of the three crimes involve the unlawful taking of property from another. Such taking is dishonest, and therefore Federal Rule of Evidence 609(a) subdivision 2 is implicated in each instance." (Tr. 12, Jan. 3, 2003.)  However in "an excess of caution," the Court would not permit cross-examination on the 1989 attempted robbery.  Id.

### 2. Rule 404(b) Motion

In a motion in limine dated December 20, 2002, the government sought to introduce evidence of Thomas' 1980 robbery conviction under Fed. R. Evid. 404(b).  Rule 404(b) states that evidence of a defendant's past crimes is admissible to prove intent, motive or opportunity, but not admissible to prove the defendant's bad character.

The Court ruled that "[n]othing is admissible in the first instance.  Once, however, the defense puts into issue intent, that is, the intent to possess the pistol, the door is open, and I will then permit the 1980 felony robbery with the .22 caliber pistol to be gone into on the government's direct case, if you open the door in your opening." (Tr. 8, Jan. 3, 2003.)  In her opening statement, Thomas' attorney Margaret Shalley opened the door.  She stated that

"Thomas temporarily took possession of the weapon intending to rid himself of it as soon as possible under the circumstances."  (Tr. 59.)

### 3. **Motion to Recuse the Prosecutor**

At a pre-trial conference on January 6, 2003, Ms. Shalley argued that the prosecutor should be recused from the case because he was a potential witness at trial.  A New York City Police Department report contained the details of a conversation between the prosecutor and one detective that was relayed to a second detective, who wrote the report.  After reviewing the report, the Court rejected Ms. Shalley's application to recuse the prosecutor.  (Tr. 5, Jan. 6, 2003.)  The Court said: "[T]here is no indication that [the prosecutor], even if the double, indeed it may be triple, hearsay in the police report is accurate, that [the prosecutor] did anything wrong or that there is any reason why [the prosecutor] should be called as a witness."  (Tr. 5, Jan. 6, 2003.)

Ms. Shalley then argued that the police report showed that the prosecutor had attempted to structure witness Hansberry's testimony so that Hansberry would state that he had assaulted Thomas because Thomas had a gun.  (Tr. 7, Jan. 6, 2003.)  The Court again denied the application, after hearing a proffer from the prosecutor that he did not tell any detective to structure Hansberry's testimony.

### 4. **Motion to Call Hansberry**

On December 29, 2002, Ms. Shalley made a motion in limine to permit the defendant to call Hansberry at trial, even though Hansberry had already announced his intention to assert his Fifth Amendment right against self-incrimination.  Ms. Shalley suggested that if Hansberry did

invoke his Fifth Amendment privilege, the Court could compel the government to offer him

immunity.  The government opposed this motion in a letter dated December 27, 2002.[1]

Once the trial had begun, the Court permitted Ms. Shalley to examine Hansberry outside

the presence of the jury.  Answering Ms. Shalley's questions on the stand, Hansberry stated that

he lived in the area of 171st Street and Wythe Place, that Thomas used to live in the same

neighborhood, and that he had known Thomas all of his life.  Hansberry asserted his Fifth

Amendment privilege and refused to answer questions about his occupation or the events leading

up to Thomas' arrest on July 14, 2002.  (Tr. 29-43.)

Ms. Shalley argued that the admission of his testimony regarding his prior relationship

with Thomas would partially corroborate Thomas' anticipated testimony at trial.  Ms. Shalley

asserted that the Court could allow a party to call a witness who would invoke his right against

self-incrimination before the jury, and that the probative value of Hansberry's testimony would

outweigh any unfair prejudice to the government, especially if the Court gave a curative

instruction.  (Tr. 38-39.)

Based on United States v. Deutsch, 987 F.2d 878, 883-84 (2d Cir. 1993), the Court ruled

that "the fact that the witness Hansberry has asserted his Fifth Amendment privilege precludes

either side from calling him...the invocation of the privilege would be prejudicial to the

government's position in the case and there is no curative instruction that could be given that

would repair the damage done by the pleading of the Fifth."  (Tr. 40-41.)  On the issue of

compelled immunity, the Court applied United States v. Diaz, 16 F.3d 52, 115 (2d Cir. 1999),

---

[1]The Court assumes that the government's response letter, dated December 27, in reply to
Ms. Shalley's motion, dated December 29, represents a clerical oversight.

holding that the government is not required to grant immunity to a witness unless extraordinary circumstances are present.

After confirming that the government refused to grant immunity to Hansberry, the Court asked, "Is there anything more you want to argue about the grant of immunity, Ms. Shalley?" (Tr. 41.)  Ms. Shalley answered, "No." (<u>Id</u>.)

**5. <u>Thomas' Trial Testimony</u>**

At trial, Thomas testified that after leaving the scene of the second confrontation with Hansberry, he had intended to go to a police station to get help, when he ran into the hood of Detective Rosario's car.  (Tr. 166-74.)  Thomas insisted that he never tried to get into a livery cab and that he had gone to the area alone, without his wife, and had no plans to meet her that day. When asked about the woman seen helping Thomas down the street, Thomas changed his story and claimed that his wife had helped him after the attack because someone must have called her. (Tr. 205-7.)

Following a jury verdict, Thomas was convicted on one count of illegally possessing a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).

**6. <u>Motion for a New Trial</u>**

On April 8, 2003, following his conviction, Thomas moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  Thomas' motion principally challenged comments made by the prosecutor during the summation and rebuttal summation, which Thomas argued improperly implied that Thomas had the burden of proof to demonstrate his innocence.  In addition, Thomas argued he was prejudiced by other comments during the Government summations regarding his character and prior experience with guns, as well as by two cross-

examination questions posed by the prosecutor to Thomas, to which the District Court had

sustained Thomas' objections.  The Court, in a written opinion, denied Thomas's motion in its

entirety.  See United States v. Thomas, 2003 WL 1961532 (S.D.N.Y. Apr. 25, 2004) (Keenan,

J.).  The Court sentenced Thomas to 188 months of imprisonment, to be followed by three years

supervised release.

　　　　　　**7. Thomas' Appeal**

　　　　In Thomas' appeal from his conviction, he repeated the arguments made in his Rule 33

motion, contending that the Government had deprived him of a fair trial by asking improper

questions during cross-examination and making improper arguments and shifting the burden of

proof during summation.  Thomas also claimed that the Court abused its discretion in admitting,

pursuant to Rule 404(b), evidence of Thomas' 1980 conviction involving the use of a pistol.

Finally, Thomas contended that the Court improperly excluded the testimony of Raheem

Hansberry.

　　　　The Court of Appeals rejected each of Thomas' arguments.  See United States v. Thomas,

89 Fed. Appx. 303 (2d Cir. 2004).  The Second Circuit held that "the prosecutor's remarks

during summation were proper and Judge Keenan's instructions to the jury mitigated any

prejudice.  Moreover, the district court promptly sustained objections to the two cross-

examination questions about which Thomas complains.  When viewed against the entire trial, the

prosecutors' conduct did not deprive Thomas of a fair trial."  Id. at 303.

　　　　The Second Circuit did not reach the merits of Thomas' claim that his prior conviction

was improperly admitted pursuant to Rule 404(b), finding that any possible error was harmless.

The Second Circuit noted that "[t]he jury would have convicted Thomas on the sheer

implausibility of his defense, the inconsistencies in his trial testimony and the doubt cast upon his credibility by cross-examination." Id. at 303-04.  Regarding Thomas' argument that the Court improperly excluded Hansberry's testimony, the Court of Appeals held that the Court did not abuse its discretion "because [Hansberry's] assertion of the Fifth Amendment privilege would have had a highly prejudicial effect" and district courts, under United States v. Deutsch, 987 F.2d 878, 883-84 (2d Cir. 1993), have the discretion to prevent a party from calling a witness solely to have him invoke the self-incrimination privilege in front of a jury.  Id. at 304.

Thomas now brings the instant habeas petition, alleging ineffective assistance by his trial and appellate counsel, Ms. Shalley.

## Discussion

To assert a valid claim of ineffective assistance of counsel, a petitioner must satisfy a two-part inquiry.  See Strickland v. Washington, 466 U.S. 668, 687 (1984).  First, the petitioner must show that the representation fell below "an objective standard of reasonableness" under "prevailing professional norms." Id. at 687-88.  A reviewing court  "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that 'there are countless ways to provide effective assistance in any given case' and that 'even the best criminal defense attorneys would not defend a particular client in the same way.'" United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (quoting Strickland, 466 U.S. at 689).

Second, the petitioner must "affirmatively prove prejudice," demonstrating that "but for counsel's unprofessional errors, the result of the proceeding might have been different." Id. at 693-94.  If both of these elements are satisfied, a petitioner can demonstrate that his counsel's

9

representation "was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. at 687.  The ineffectiveness inquiry should focus on "the fundamental fairness of the proceeding whose result is being challenged."  Strickland, 466 U.S. at 696.

Thomas asserts that Ms. Shalley was ineffective in eight ways. The Court addresses each ground in turn.[2]

### 1. Motion to Immunize Hansberry

Thomas argues that Ms. Shalley was ineffective for her failure to investigate the law and facts surrounding immunized testimony.  (Petr.'s Br. 1.)  In Thomas' mind, if Ms. Shalley had better understood the relevant law the Court would have immunized Hansberry or the Court would have permitted Ms. Shalley to question Hansberry in front of the jury.

The relevant law does not support Thomas' position.  Under United States v. Deutsch, 987 F.2d 878, 883-84 (2d Cir. 1993), district courts have the discretion to prevent a party from calling a witness solely to have him invoke his Fifth Amendment privilege in front of a jury.  In response to Ms. Shalley's motion in limine to require Hansberry to appear as a witness, the Court permitted Ms. Shalley to ask the proposed questions outside the presence of the jury.  After his testimony, Ms. Shalley further argued in favor of the inclusion of Hansberry's testimony.  The Court, in its discretion, denied Ms. Shalley's motion.

In United States v. Diaz, the Second Circuit held that the court is not required to order the government to grant immunity to a defense witness unless extraordinary circumstances are present.  See 176 F.3d 52, 115.  To determine if extraordinary circumstances are present, a three-

---

[2]While Thomas' petition divides his argument into nine grounds, the Court condenses the argument into eight grounds for the sake of clarity.

part test should be applied:

> [f]irst, the district court must find that the government, through its own overreaching, has forced the witness to invoke the Fifth Amendment or, that the government has engaged in discriminatory use of grants of immunity to gain a tactical advantage; second, the witness' testimony must be material, exculpatory and not cumulative; and third, the defendant has no other source to obtain the evidence.  Id.

Ms. Shalley argued, in writing and orally, that the Court should compel the government to immunize Hansberry to guarantee his testimony.  Because there was no evidence that the government forced Hansberry to invoke the privilege, no evidence that the government engaged in discriminatory use of grants of immunity for tactical advantage, and because Thomas himself could offer the same evidence as Hansberry, the Court denied the motion.  (Id.)  Notably, Thomas does not detail any "extraordinary circumstances" in his petition.

Thomas cannot establish that Ms. Shalley fell below Strickland's "objective standard of reasonableness," much less show prejudice on this ground.

## 2. Failure to Object to the Court's Interpretation of Fed. R. Evid. 609

Thomas contends that Ms. Shalley failed to object to the Court's interpretation of Fed. R. Evid. 609(a)(2).  (Petr.'s Br. 1-2.)  Thomas argues that Ms. Shalley should have tendered to the Court the conflicting interpretation of the Advisory Committee Notes.  Although Thomas does not specify which Advisory Committee comments conflict with the Court's statements, the government suggests Thomas is referring to a passage accompanying the 1990 amendments to Fed. R. Evid. 609, in which the Advisory Committee states that the Report of the House and Senate Conference Committee provides sufficient guidance to trial courts and that no amendment is necessary, notwithstanding some decisions that take an unduly broad view of 'dishonesty,' admitting convictions such as for bank robbery or bank larceny."  The applicable Conference

Report states that

> [b]y the phrase 'dishonesty and false statement,' the Conference means crimes such as perjury, subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of <u>crimen falsi</u>, commission of which involve some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully.

What Thomas fails to mention is that in Ms. Shalley's letter of December 27, 2002, she did argue that the convictions were not proper impeachment material because they were not crimes of dishonesty or false statement. Her efforts were partly successful in that the Court did preclude the government from impeaching Thomas with his 1989 conviction. This is not a performance that falls below an objective standard of reasonableness.

In any event, Thomas cannot demonstrate prejudice. Even without impeachment by his prior convictions, Thomas' credibility was weakened by dubious assertions in his testimony, such as the question of his wife's absence or presence on the night in question, and his denial of his efforts to get into a livery cab. As the Second Circuit noted in its rejection of Thomas' appeal, the jury would have convicted Thomas "on the sheer implausibility of his defense, the inconsistencies in his trial testimony and the doubt cast upon his credibility by cross examination." <u>United States v. Thomas</u>, 89 Fed. Appx. at 303-04.

### 3. <u>Motion to Recuse Prosecutor</u>

Thomas asserts that Ms. Shalley was ineffective for failing to continue to contest the Court's denial of his request to call two police officers as witnesses in support of the motion to recuse the prosecutor. (Petr.'s Br. 2-3.) However, Ms. Shalley did continue to press the issue. At a pre-trial conference on January 6, 2003, Ms. Shalley followed up on the written motion to have the prosecutor recused. (Tr. 3-12, Jan. 6, 2003.) The Court again rejected the application.

(Tr. 5.)

Even after this second rejection of her application, Ms. Shalley continued to argue that Hansberry's testimony may have been structured and requested the opportunity to question one of the police officers out of the presence of the jury.  (Tr. 6-7.)  The Court denied the application for a third time.  (Tr. 10.)   Therefore, contrary to Thomas' assertion, Ms. Shalley's representation was well within the range of reasonable professional assistance.

### 4. Advice to Thomas on his Direct Testimony

Thomas accuses Ms. Shalley of ineffective representation because on direct examination she asked him to discuss the underlying facts of his prior convictions.  (Petr.'s Br. 6-7.)

In her affidavit, Ms. Shalley indicated that she prepared Thomas to discuss his prior convictions on direct examination in light of the Court's Rule 609 and Rule 404 rulings.  On the stand, Thomas answered calmly and unhesitatingly, readily admitting his guilt of those crimes. The Court assumes that Ms. Shalley employed the established technique of beating the government to the punch in an effort to minimize the effect of the government's efforts on cross-examination to impeach Thomas.  See 1 Federal Evidence Courtroom Manual Rule 703, Advisory Committee Notes to 2000 Amendments (noting that "in some circumstances the proponent might wish to disclose information ... in order to 'remove the sting' from the opponent's anticipated attack, and thereby prevent the jury from drawing an unfair negative inference"); see, e.g., Cruz v. Greiner, 1999 U.S. Dist. LEXIS 17695, 42 (S.D.N.Y. 1999), United States ex rel Walker v. Follette, 311 F. Supp. 490, 495 (S.D.N.Y. 1970).

The Strickland ruling notes that courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," considering that

"there are countless ways to provide effective assistance in any given case," and that "even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689 (quoted in United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990).   Given counsel's wide latitude in setting defense strategy, Ms. Shalley's representation does not fall below the Strickland standard.

### 5. **The Opening Statement Puts Intent at Issue**

Thomas contends that Ms. Shalley's opening statement, by putting intent at issue, permitted the government to introduce undue prejudicial evidence against him.

Recall, Thomas' initial statement was based on the claim that he had no intent to illegally possess a firearm.  This was to be his defense at trial.  Thus, Ms. Shalley's decision to introduce the issue of intent in order to pursue this strategy was well within the range of reasonable professional assistance required by Strickland.  Additionally, there was no prejudice:  Due to the Court's ruling on the Rule 609 evidence, Thomas was subject to cross-examination about the 1980 robbery conviction, regardless of whether Ms. Shalley introduced the issue of intent in her opening statement.

### 6. **Failure to Object to Improper Questioning During Direct Testimony**

Thomas argues that Ms. Shalley was ineffective because she failed to object to the Court's and the government's improper questioning of Thomas on cross examination about his 1980 and 1996 convictions.  (Petr.'s Br. 8-10, 12-14.)

Any objections by Ms. Shalley to the Court's examination of Thomas would have been futile.  The Court has the authority and discretion to oversee the examination of witnesses. Under Fed. R. Evid. 611(a), the "court shall exercise reasonable control over the mode and order

of… presenting evidence so as to… make the presentation effective for the ascertainment of the truth." The Second Circuit has held that a trial court "may actively participate and give its own impressions of the evidence or question witnesses, as long as it does not step across the line and become an advocate for one side." United States v. Filani, 74 F.3d 378, 384 (2d Cir. 1996). The Court is granted explicit authority to question witnesses by Fed. R. Evid. 614(b), which states that the Court "may interrogate witnesses, whether called by itself or a party."

The 1980 robbery conviction was a proper area of inquiry following the Court's Rule 609 ruling. The Court acted appropriately, under the Fed. R. Evid. and case law, in asking clarifying questions. Finally, in its instructions to the jury, the Court explained that the Court's questions were intended to clarify any confusion at trial and that no adverse inferences to the defendant should be drawn from them. (Tr. 273-74.)

As to the government's questions, Ms. Shalley did object to several of the government's questions that surpassed the Court's ruling on the 1996 conviction. The Court sustained her objections to questions about Thomas' threat to the 1996 robbery victim to induce the victim not to testify, and whether Thomas supported himself with drug dealing, and the Court overruled an objection to a question regarding his memory of being arrested because of that threat. (Tr. 195, 215-16.)

Thomas cannot demonstrate ineffective assistance of counsel on this ground.

### 7. Failure to Object to the Jury Charge

Thomas argues that Ms. Shalley was ineffective because she failed to object to the Court's jury charge concerning the Rule 609 impeachment evidence. (Petr.'s Br. 10-12.)

The Court instructed the jury: "Those prior convictions were received into evidence

during his testimony for the sole purpose of helping you to decide how much of his testimony to believe.  You may consider the defendant's prior convictions for the limited purpose of helping you decide how much of his testimony to believe and what weight, if any, to give it."  (Tr. 282.) These instructions informed the jury of the law and did not mislead them as to the proper legal standard for considering Rule 609 evidence.  Thus, any objection would have been overruled.

### 8. **Failure to Raise Issues in the Rule 33 Motion or on Appeal**

Thomas argues that Ms. Shalley was ineffective because she did not raise the prosecutor's alleged attempt to structure Hansberry's testimony in either Thomas' Rule 33 motion or on appeal.  (Petr.'s Br. 14-15.)

The Court notes that the Strickland test of ineffective counsel also applies to appellate counsel.  See Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).  In Mayo, the Second Circuit held that inadequate performance on appeal may be established by proof that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Id. at 533.  Generally, the presumption of effective assistance of counsel will only be overcome "when ignored issues are clearly stronger than those presented."  Mayo, 13 F.3d at 528 (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1985)).

Ms. Shalley determined that she could not argue the recusal issue in good faith on appeal because there was no evidence to support the theory that the double or triple hearsay amounted to misconduct.  See letter from Ms. Shalley to Thomas, Nov. 20, 2003.  The same reasoning applies to the Rule 33 motion.  If Ms. Shalley pursued the recusal issue, she believed the weakness of the claim would only diminish Thomas' credibility.  See id.  Ms. Shalley acted within the reasonable standard of representation when she did not raise the issue in the Rule 33 motion or the appeal.

16

## Conclusion

For the reasons set forth above, the Court denies Thomas' petition for a writ of habeas corpus. The Court directs the clerk of the Court to close this case and remove it from the active docket of the Court.

SO ORDERED.

Dated: New York, New York
March 30, 2007

**JOHN F. KEENAN**
**United States District Judge**